UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DAJUAN KEY,  )
   Plaintiff,  )
  )
vs.  )
  )    Case No. 14-2279
  )
JOHN JUERGENSS, et.al,  )
   Defendants.  )

## **SUMMARY JUDGMENT ORDER**

This cause is before the Court for consideration of the Defendants' motions for summary judgment. [62, 65]. The Plaintiff, a pro se prisoner, alleges his constitutional rights were violated at the Jerome Combs Detention Center from October 6, 2014 to October 15, 2014. Specifically, Plaintiff claims Officers John Juergens and Todd Schloendorf violated his rights based on his living conditions in a suicide watch cell; and Defendants Juergens, Schloendorf and Mental Health Worker Aimee Orr failed to provide mental health services during this time. *See* November 21, 2014 Merit Review Order. For the following reasons, the Defendants motions are denied. [62, 65]

## I. MATERIAL FACTS

Plaintiff entered the Jerome Combs Detention Center (JCDC) on May 15, 2014 and remained at the facility until July 29, 2015. (Def. Mot. [62], Plain. Depo., p. 32; Def. Mot. [65], Sch. Aff., p. 1). Defendant Aimee Orr is a mental health worker at the facility.[1] Defendant Todd Schloendorf is a sergeant at JCDC who is responsible for supervising other officers and

---

[1] Defendant Orr provides no information about her job title, qualifications or responsibilities in either affidavit she has provided to the Court.. (Def. Mot.[62], Orr Aff.; Def. Mot., [65] Orr Aff.)

maintaining order and security at the facility. (Def. Mot. [65], Sch. Aff., p. 1). Schloendorf says he generally works in Booking, but he also goes to other areas of the jail as needed.

On October 6, 2014, Defendant Schloendorf was told to move Plaintiff to Max Unit B in segregation, because Plaintiff had an altercation with another inmate. (Def. Mot. [65], Sch. Aff., p. 2). Schloendorf say typically before an inmate is moved, the new cell is checked for contraband or any damage to the cell. To his knowledge, Schloendorf says staff checked Plaintiff's new cell before he was transferred.

Around 9:20 a.m, Schloendorf and several other staff members moved Plaintiff into Max B, Cell #4. Once he was inside the cell, Schloendorf removed Plaintiff's handcuffs without incident. (Def. Mot. [65], Sch. Aff., p. 2). However, after Schloendorf left, Plaintiff began beating his head on the cell window. Staff asked the Plaintiff to stop several times, but he refused their orders. Therefore, Defendant Schloendorf says he decided to move Plaintiff to a restraint chair for his own safety.

Plaintiff remained in the restraint chair until he appeared to calm down, then Schloendorf moved Plaintiff back to Cell #4 at about 11:30 a.m. (Def. Mot. [65], Sch. Aff., p. 2). Once he was back in his cell, Plaintiff again began to bang his head on the cell window. Defendant Schloendorf moved Plaintiff back to a restraint chair for his own safety.

The exact time Plaintiff was subsequently taken to the Health Care Unit and placed on suicide watch is unclear from the record. Schloendorf says he does recall the Plaintiff asking to see Defendant Aimee Orr at some point after he was moved to segregation. Schloendorf phoned Orr and informed her of Plaintiff's request. However, later that day, when Plaintiff was ordered to sit on his bunk so staff could deliver lunch, but Plaintiff again began to bang his head on the

cell window. At this point, Plaintiff was taken to the medical department, where he was seen by Orr. (Def. Mot. [65], Sch. Aff., p. 2).

Plaintiff claims he was taken to the medical department because he refused to use the catheter when he was placed in the restraint chair.(Def. Mot. [62], Plain. Depo., p. 39). The Plaintiff met with a nurse, but he still refused to cooperate. Plaintiff says he did see Defendant Aimee Orr while he was in the Health Care Unit and she also tried to convince him to use the catheter without success. (Def. Mot. [62], Plain. Depo., p. 39-40). Orr says at the end of her last encounter with the Plaintiff, she told him to submit a request to see her when he was ready to talk.(Def. Mot.[62], Orr Aff., p. 1).

Plaintiff was moved back to his cell at approximately 1: 30 P.M. Defendant Schloendorf ordered Plaintiff to be placed on suicide watch due to threats of self-harm. Plaintiff's property was then removed, and staff began making 15 minute checks on his welfare. (Def. Mot. [65], Sch. Aff., p. 2).

Plaintiff remained on suicide watch in Max Unit B, Cell #4 for ten days. (Def. Mot. [62], Plain. Depo., p. 40-41). Max B is a maximum security unit where each inmate is housed in his own cell with a bed, toilet and sink. (Def. Mot. [65], Sch. Aff., p. 1). Every morning the inmates are offered the opportunity to clean their own cells. If an inmate chooses to clean, they are allowed out of their cells to obtain cleaning supplies including a mop, broom, dustpan, squirt bottle of cleaning solution and a toilet cleaning solution. (Def. Mot. [65], Sch. Aff., p.1-2). Once the cleaning is completed, the inmate is secured in his cell and the next inmate is offered the opportunity to clean his cell. (Def. Mot. [65], Sch. Aff., p. 2).

Each inmate is also allowed one hour out of his cell each day to use the phone, take a shower or watch television. If an inmate is on suicide watch, they are given their property bins at

this time which include soap, towels, washcloths and other hygiene items. (Def. Mot. [65], Sch. Aff., p. 2).

Plaintiff's time on suicide watch ran from October 6, 2014 to October 15, 2014. Defendant Schloendorf says his work records indicate he did not work on October 9, 10 or 15, 2014. Schloendorf did work on October 11 through October 14 of 2014, but he was assigned to Booking. (Def. Mot. [65], Sch. Aff., p. 1). Defendant John Juergenss is a Correctional Officer at JCDC and the Kankakee County Detention Center (KCDC). Juergenss says his work records confirm he did not work on Ocotgber 6, 7, 11 or 12 of 2014. On October 9 and 10 of 2014, Juergenss worked as a "rover" which means he worked throughout the facility as needed. (Def. Mot.,[65], Jur. Aff., p. 1). The officer says he does not recall seeing the Plaintiff on either day. However, Plaintiff was assigned to the Max unit where Plaintiff was housed on October 6, 2014 and October 15, 2014. The remainder of the relevant time period Juergenss was assigned to other housing units and he did not have contact with Max inmates. ( Mot.,[65], Jur. Aff., p. 1).

Christopher Larsen, Tyler Fox, Tyrone Campbell, Michael Georgelos and William Georgeff were also correctional officers at both JCDC and KCDC. Their work schedules indicate they worked on the Max Unit on different occasions during the Plaintiff's ten days on suicide watch[2]. Larsen and Campbell say the Plaintiff was offered a chance to clean his cell on October 7, 2014, but he refused. (Def. Mot.,[65], Camp. Aff., p. 1; Lar. Aff., p. 1). On October 8, 2014, Georgeff says Plaintiff again refused an opportunity to clean his cell. (Def. Mot.,[65], Geo. Aff., p. 1).

---

[2] The record demonstrates the following officers worked on these specific dates: Oct. 6- Georgeff, Oct. 7- Larsen and Campbell, Oct.8- Georgeff; Oct. 9- Fox; Oct. 10-Campbell; Oct. 13- Georgelos; Oct. 14- Campbell and Georgeff; Oct. 15- Larsen.

4

On October 9, 2014, Plaintiff spread feces on his cell door. Plaintiff asked Correctional Officer Fox if he would clean off Plaintiff's window. In response, Officer Tyler gave Plaintiff a squirt bottle of cleaning solution and paper towels to clean. Plaintiff cleaned a small portion of his cell, took a shower and then used his phone. (Def. Mot.,[65], Fox Aff., p. 1). Correctional Officers twice ordered Plaintiff to finish cleaning his cell before he used his phone. Plaintiff then picked up the bottle of cleaning solution, removed the cap and appeared to drink the solution. (Def. Mot.,[65], Fox Aff., p. 1). Officers then called Booking to notify a supervisor while Plaintiff took the cleaning bottled to his cell and locked himself in. When back-up officers arrived, Plaintiff was ordered to put the cleaning bottle outside of his door. Plaintiff complied. Schloendorf ordered correctional officers to have an inmate trustee clean Plaintiff's cell instead of providing Plaintiff with any additional cleaning solution. (Def. Mot. [65], Sch. Aff., p. 3). The Medical Department was notified of the incident, but staff noted the small amount of solution consumed would not harm Plaintiff. (Def. Mot.,[65], Fox Aff., p. 1).

Correctional Officer Campbell says Plaintiff was moved to the gym on October 10, 2014, while a trustee came to Plaintiff's cell to clean the feces Plaintiff had smeared on the window. It is unclear from the record whether the feces was from the day before or from a new incident. After it was cleaned, Plaintiff was returned to his cell. (Def. Mot.,[65], Camp. Aff., p. 1).

On October 13, 2014, Plaintiff flooded his cell and the entire first floor of Max B. Correctional Officer Georgelos called Booking to notify a supervisor. Defendants Juergens and Schloendorf responded. Officers turned off the water to Plaintiff's cell to prevent any additional flooding. (Def. Mot.,[65], Jur. Aff., p. 1). Inmate workers were assigned to clean up Max B, but Plaintiff and the inmates claim no one cleaned water from Plaintiff's cell.

5

Defendant Orr says she has no authority regarding an inmate's cell assignment. Nonetheless, she asked correctional officers on Ocotber 15, 2014 if the Plaintiff could be moved to another cell, and she was informed they were already getting ready to move the Plaintiff. (Def. Mot. [62], Orr Aff., p. 2). Orr does not indicate why she made this request on October 15, 2014.

Correctional Officers Juergens, Larsen, Fox, Campbell, Georgelos and Georgeff say they do not remember the Plaintiff making any specific complaints about his toilet during the relevant 10 day period. (Def. Mot.,[65], Lar. Aff., p. 1; Geo. Aff., p. 1; Camp. Aff., p. 1). Each maintains if Plaintiff had complained, they would have notified maintenance to fix the problem. Correctional Officer Larsen adds when Plaintiff was removed from suicide watch and inmate trustee was assigned to clean Plaintiff's cell, the toilet flushed without any difficulty at that time.(Def. Mot.,[65], Lar. Aff., p. 1-2).

Schloendorf says throughout Plaintiff's incarceration, he asked to speak with Defendant Orr on several occasions, and each time Schloendorf either informed Orr directly or notified the Medical Department. (Def. Mot. [65], Sch. Aff., p. 3) Defendant Juergens says he took the same action whenever Plaintiff told him he wanted to speak with Orr. (Def. Mot. [65]; Jur. Aff., p. 2)

Schloendorf says he remembers multiple occasions Plaintiff smeared feces in his cell while in segregation, but he does not recall the specific dates. (Def. Mot. [65], Sch. Aff., p. 3) Schloendorf says he also remembers the Plaintiff putting feces on his food tray before handing it to a correctional officer, but again he does not remember the exact date. (Def. Mot. [65], Sch. Aff., p. 3). Officers filed several incident reports claiming Plaintiff threw feces on three occasions, slide feces under his door on two occasions, and put feces on a paper plate and slide it under his door on one occassion. (Def. Mot. [65], Ex. 12). Plaintiff denies these incidents took place and it is unclear if he was disciplined as a result of any of these allegations. Schloendorf

6

further remembers Plaintiff flooded his cell on multiple occasions which he was incarcerated at JCDC.

Plaintiff says he had no property or writing utensils to make a request to see mental health staff while he was on suicide watch. Nonetheless, Plaintiff says he repeatedly asked correctional staff to tell Defendant Orr he wanted to speak with her.

Defendant Orr says it is her understanding medical staff visited the Plaintiff daily while he was on suicide watch to dispense medications. (Def. Mot. [62], Orr Aff., p. 1). Orr says she also believed medical staff or correctional staff would inform her if the Plaintiff wanted to see her. Nonetheless, Orr says she did not receive any requests concerning the Plaintiff from October 6, 2014 to October 15, 2014. (Def. Mot. [62], Orr Aff., p. 1).

## II. LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.; Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). "In a §1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.*

### III. ANAYLSIS

As an initial matter, since Plaintiff apparently was a pretrial detainee at the time of his allegations, both of his claims arise under the Fourteenth Amendment. However, the Seventh Circuit has found it is "convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and the Eighth Amendment (convicted prisoners) without differentiation." *See Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citation omitted).

The conditions of an inmate's confinement can violate the constitution "when (1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of 'the minimal civilized measure of life's necessities,' and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 2016 WL 3457647, at *2 (7th Cir. June 24, 2016) *quoting Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

In this case, Plaintiff alleges he was confined in a cell without a working toilet, no property, standing water and smeared feces on the wall. In some circumstances, these conditions could rise to the level of a constitutional violation. *See Vinning–El v. Long,* 482 F.3d 923, 924 (7th Cir.2007) (denial of mattress, bedding, hygiene supplies in cell with standing water, non-working sink and toilet, and smeared blood and feces on walls); *Johnson v. Pelker,* 891 F.2d 136, 139–40 (7th Cir. 1989) (prisoner held for three days in segregation cell allegedly smeared with human feces and having no running water); *DeSpain v. Uphoff,* 264 F.3d 965, 974 (10th Cir.

2001) (concluding that exposure to human waste, even for 36 hours, would constitute sufficiently serious deprivation to violate Eighth Amendment). However, the Defendants maintain Plaintiff was given ample opportunities to clean his cell and Plaintiff created the unsanitary conditions when he chose to spread feces on his own cell window. Defendants argue the Seventh Circuit has specifically noted "an inmate who causes filthy conditions to exist may not have a cruel and unusual leg to stand on." *Isby v. Clark*, 100 F.3d 502, 506 (7th Cir. 1996)(case remanded for "more precise findings on contested issues about allegedly inhumane conditions.")

Nonetheless, the Defendants also acknowledge they "have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies." *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 665 (7th Cir. 2012). In other words, if Plaintiff was incapable of caring for himself due to his mental illness, and Defendants were aware of this fact, it is possible to conclude Plaintiff was not responsible for the conditions of his cell. *Id.* Defendants argue even if Plaintiff suffered from depression or other form of mental illness, it did not render him incapable of caring for himself. Unfortunately, there is a glaring lack of information concerning Plaintiff's mental health status at the time.

For instance, Plaintiff's second claim alleges all three Defendants denied Plaintiff mental health services while he was on suicide watch. To demonstrate a constitutional violation, Plaintiff must show he suffered from a serious medical need and Defendants were each deliberately indifferent to that need. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). "A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Illinois Medi–Car, Inc.*, 300 F.3d 760, 765 (7th Cir.2002) *quoting Gutierrez v. Peters,* 111 F.3d 1364, 1371 (7th

Cir.1997); *see also Foelker v. Outagamie County,* 394 F.3d 510, 512–13 (7th Cir. 2005). The Seventh Circuit has noted the "need for a mental illness to be treated could certainly be considered a serious medical need." *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).

Defendant Orr appears to allege Plaintiff did not suffer from a serious mental illness based on Orr's general statement that in her opinion, Plaintiff "did not have serious mental health issues that would have necessitated more encounters with a mental health professional than he had." (Def. Mot. [62], Orr. Aff., p. 2). However, Orr does not provide her job title, qualifications, credentials or job responsibilities. She does not state whether any medical or mental health professional ever diagnosed the Plaintiff, nor why she does not believe he suffered from a serious mental illness. It is not sufficient to simply attach hundreds of pages of medical records to both summary judgment motions without an affidavit verifying those records, nor an affidavit from a medical professional interpreting those records.

There is also very little information before the Court concerning any procedure for suicide watch. It appears Plaintiff was placed in a suicide cell not by a medical or mental health professional, but by a correctional officer. Orr says it is her "understanding" that medical staff would see Plaintiff daily to dispense medications, but it's not clear if mental health services are provided to an inmate who is deemed suicidal. (Def. Mot. [62], Orr Aff. ). Orr also claims, despite Plaintiff's allegations, there is no statute or rule or regulation which requires her to check on Plaintiff every 48 hours. Nonetheless, Plaintiff alleges despite his frequent requests, he was denied all mental health care for his entire stay on suicide watch. Defendants have not adequately addressed this claim. Based on the record, the Court cannot determine whether there is a disputed issue of material fact as to either of Plaintiff's claims.

The Court has an obligation to manage its docket and avoid the time and expense of trial on any issue for which there are no genuine disputes of material fact. *See Wainwright Bank & Trust Co. v. Railroadmens Federal Savings & Loan Association of Indianapolis,* 806 F.2d 146, 149 (7th Cir.1986)(" The primary purpose of a grant of summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute."). It is possible the resolution of all claims and Defendants will require a trial in this case, but the record raises more questions than answers concerning the Plaintiff's allegations. In addition, Rule 16 of the Federal Rules of Civil Procedure allows the court to "take appropriate action" in "formulating and simplifying the issues, or eliminating frivolous claims or defenses." Fed. R.Civ.P. 16(c) (2). Therefore, the Court will set this matter for a status hearing before setting any additional deadlines.

IT IS THEREFORE ORDERED:

1) The Defendants motions for summary judgment are denied.[62] and [65]

2) This cause is set for a status hearing on October 21, 2016 at 9:30 a.m. by telephone conference call. The Clerk is to issue a writ for Plaintiff's participation in the hearing.

3) Plaintiff is again reminded of his continuing responsibility to IMMEDIATELY notify the Court in writing of any change in his mailing address and his telephone number. Failure to provide this information will result in the dismissal of this lawsuit with prejudice.

ENTERED this 26th day of September, 2016.

.                     s/ James E.Shadid
      _____
                     JAMES E. SHADID
               UNITED STATES DISTRICT JUDGE